IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RUFUS WEST,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | 17-cv-335-wmc |
| KEVIN CARR, | | |
| | Defendant. | |

Plaintiff Rufus West a/k/a Mansa Lutalo Iyapo,[1] an inmate at Green Bay Correctional Institution ("GBCI"), is proceeding in this lawsuit against defendant Kevin Carr in his official capacity as Secretary of the Wisconsin Department of Corrections ("DOC"), asserting violations of the Religious land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, and a related breach of contract. Specifically, as a devout Muslim, West claims that the DOC's practice of cancelling in-person, congregate worship services and study groups violates his rights under RLUIPA and breaches the terms of a settlement agreement he reached with the DOC to resolve an earlier lawsuit. West has also filed a motion to certify a class of inmates for declaratory and injunctive relief with respect to his RLUIPA claim. (Dkt. #19.) Given the breadth and indefiniteness of the proposed class, as well as the inherently individualized nature of RLUIPA claims, the court will deny plaintiff's motion for class treatment as set forth below.

---

[1] West's briefing refers to himself as "Mansa," but to be consistent with its past orders, the court again refers to him by his last name.

1

BACKGROUND

**A.  The DOC's Religious Policies**

As explained by the DOC's Religious Practices Coordinator Kelli Willard West, the Division of Adult Institutions ("DAI") provides inmates with opportunities to pursue lawful practices of the religion of their choice.  However, those opportunities must be consistent with: security practices and principles; the rehabilitative goals of inmates; health and safety; the allocation of limited resources; and the needs of the various correctional institutions and facilitates.  Although not exclusive, DAI attempts to accommodate various religious beliefs by organizing available religious accommodations with an Umbrella Religion Groups ("URGs") structure, with each group sharing similar beliefs and practices. Currently, although neither exclusive nor immutable, DAI recognizes eight formal URGs: Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian.

Prisoners seeking to access religious accommodations, including access to congregate services, religious property, and diet, must formally declare a religious preference by filing a Religious Preference Form (DOC-1090) and choosing which URG aligns most closely to their own religious beliefs and practices.  Alternatively, prisoners may choose "No Preference" or "Other."  If desired, the DAI also permits prisoners to change their religious preferences once every six months by completing a new Religious Preference Form.

**B. Overview of eight URGs**

The eight URGs hold unique religious views.  Of particular relevance to West's class motion, the role and significance of congregate services and study groups within each URG varies.  Furthermore, according to Coordinator Willard-West, different theologians within the same faith community may construe sacred texts very literally or under varying interpretations.  (Willard West Decl. (dkt. #30) ¶ 25.)  Acknowledging that variations exist between and within the URGs, the DAI created a resource manual, written by community faith advisors, to guide DOC staff in accommodating each URG's religious beliefs and practices.  (Willard West Decl., Ex. 105 (dkt. #30-3).)  The following is an overview of the DOC's guidance with respect to each URG's religious beliefs pertaining to worship services and study groups:

Catholics.  This URG focuses on Catholic "sacramental life."  Although all sacraments require a priest as a spiritual leader and are communal in nature, a deacon or trained layperson may be able to conduct a worship service to celebrate the Eucharist. Some Catholics may find religious studies -- for example, scripture and spiritual reading or praying the Rosary -- essential to spiritual development.  (*Id.* at 6-7.)  A Catholic spiritual leader or volunteer is needed for such studies.

Eastern Religions.  This Eastern religious URG focuses primarily on Buddhism and Hinduism.  Buddhism has many traditions, but it is customary to gather on a periodic basis, usually weekly, "to chant sutras (sacred scriptures) that embody the tradition's teachings, to meditate and to offer prostrations and incense in honor of the Buddha."  (*Id.*

at 9-11.)  A spiritual leader or authorized volunteer leads the meditation practice and is necessary for worship services.  (*Id.*)

Hinduism, as described in the resource manual, is a "unique religion" with "no founder, no uniform dogma, no hierarchical priesthood, no direct revelation and no rigidly described moral code.  Some Hindus worship spirits and other deities, while others engage in the most profound philosophical speculation."  Similar to Buddhists, Hindus come together regularly to worship with focus on a deity, including Shiva, Parvati, Ganesha, Vishnu, and one of his avatara, Krishna.  Before worship, a devout Hindu will purify himself with water.  For congregate worship, the worshipper places items for offering, such as food or flowers, in a fire that a priest has blessed.  The ashes are then rubbed on the worshipper's forehead.

Humanist/Atheist/Agnostic:[2]  This URG is comprised of humanists, atheists and agnostics, none of whom tend to hold a particular creed or dogma, and instead focus on the value of humans.  There are generally no requirements to be a member in these belief systems.  Electronic video streaming (live or recorded) are acceptable for services, with the most important part of the service being a discussion that takes place after the formal service.  (McKenzie Decl. (dkt. #31) ¶¶ 13-16.)

Islamic:  Islam is a monotheistic religion focused on the teachings of Muhammad, as is this URG.  The standard practice depends on "what constitutes an islamically

---

[2] The resource manual was created prior to the DOC creating this URG, which is why the DOC provided a description of this URG from Zachary McKenzie, the Chaplain at Taycheedah Correctional Institution.  (McKenzie Decl. (dkt. #31).)  McKenzie explains that in 2016 he became a Humanist and is endorsed by the Humanist Society as a Chaplain/Celebrant.  (*Id.* ¶ 13.)

acceptable observance in the controlled environment of a corrections facility." (Ex. 105 (dkt. #30-3) at 17.)   For congregate services, Muslim prisoners attend a Friday congregational prayer, during which an Imam -- the leader of the Mosque -- conducts the prayers and worship services.  Muslim inmates are to pray individually five times per day. Muslims also have obligatory days of special significance:  Ramadan (29-30 days of disciplined fasting); Eid ul Fitr, and Eid ul Adha.  (*Id.* at 17-20.)

Judaism:   Groups within the Judaism URG are (1) Orthodox Judaism, (2) Conservative Judaism, (3) Reform Judaism, and (4) Reconstructionist Judaism.  These four groups have variations with respect to beliefs, practices, ritual observance, lifestyles and degree of acculturation.  However, a common focus is regular group worship.  The DOC's resource manual provides that "[a] quorum (Minyan) of ten adult Jewish males and/or females is usually required to hold a formal Jewish worship service, but this requirement may be waived in a prison setting."  (*Id.*)   Portions of the Torah are publicly read throughout the Jewish calendar year on Sabbath (Friday), and each Monday and Thursday. There are other readings on various holy days.  Devout Jewish prisoners are required to pray three times a day, but those prayers can be private.

Pagan:  Paganism is a "worldwide Nature religion rooted in antiquity."  This URG's belief system takes many forms, including the Wiccan religion, Animism, Pantheism, Druidism, Heathenism, and others.  Pagan congregate services include rituals for the eight Sabbats, lunar rituals, and instruction.  The rituals can include "purification of participants and the site, casting the circle, invocations, meditation, prayer, chanting, energy work, thanksgiving, and uncasting the circle.  (*Id.*)

Native American:  There are eleven federally recognized tribes in Wisconsin, each holding its own tradition, beliefs and history.  Faith subgroups with a significant presence in Wisconsin include Native American Church, Midewiwin, General Anishinabe Traditions and Beliefs, Big Drum, and Longhouse.  However, Native American spirituality is fluid and personal; each claim or family line, and each religious or spiritual society may have different traditions, beliefs, and history, many of which relate to nature and the natural world.  Ceremonies are led by elders and spiritual leaders, but the leaders do not impose beliefs or doctrines.  Leadership is chosen, inherited, or the result of a personal calling or vision.

Protestant:  Protestantism arose from a split with the Catholic Church in the 15th century, and it now includes more than two hundred denominations and churches.  As a result, this URG's worship "ranges all the way from the quiet Quakers [meeting] to the enthusiasm of [a] Pentecostal[] [revival] . . . from complete freedom of expression and spontaneity to relatively set patterns of worship."  (*Id.* at 49-52.)  Protestant prisoners often meet in groups once a week, preferably Sunday.  Pastors or priests lead worship or Bible study.  Depending on the standards of the officiating clergy, Protestant prisoners are allowed to take Holy Communion at worship services.  (*Id.*)

## C. Congregate and non-congregate services in prison

DAI attempts to provide prisoners with a URG designation worship services consistent with their personal faith.  DAI policy requires congregate religious services (e.g., worship, study groups, readings, prayers, choir, drumming) to be facilitated or supervised by a community volunteer spiritual leader/clergy, chaplain, or other DOC staff member.

(Willard-West Decl., Ex. 101 (dkt. #30-2) 7.)   Worship services in particular must be facilitated by a Chaplain of that faith or by a qualified volunteer.

Each DOC facility establishes its own guidelines with respect to the minimum number of prisoners that must designate a particular religious preference before a religious worship service or study group is authorized.   For example, where West is incarcerated at GBCI, a minimum of 15 participants are required before a URG is allowed to hold congregate religious services.[3]

When no religious volunteer is available to attend a scheduled religious service, DAI policy further prohibits prisoners from leading their own religious services or study groups, in light of numerous security concerns associated with prisoner-led worship services. However, when a volunteer is unavailable, the DOC offers alternatives to cancelling the services; indeed, the DAI encourages facilities to permit a URG to gather at the scheduled time using other means, such as a movie, *or* to permit the URG to reschedule the event when a volunteer is available.

Additionally, DAI Policy 309.61, "Congregate Religious Event Conduct," provides an avenue for facility chaplains to allow prisoners to take on a very limited role in leading congregate services.   For example, under this policy, a chaplain (or his or her designee) may assign and supervise one or more prisoners to carry out certain roles within a congregate event, such as calling the prayer, carrying the pipe, leading the choir, reading a designated

---

[3]  Currently, due to the COVID-19 pandemic, volunteer entry has been suspended to limit the spread of the disease.

passage, performing as a musician, or acting as a fire starter, although the policy requires that prisoner roles rotate to avoid having any prisoner be labeled a "leader."

In 2016, the DOC also started a project offering Jumu'ah services via live video stream from Fox Lake Correctional Institution ("FLCI"). This program has extended to 28 sites. It began as a function of West's settlement with the DOC regarding cancellation of services.

### D. West's prior lawsuit and allegations

As mentioned already, this lawsuit is an offshoot of one brought by West in 2011, in which he alleged that the DOC violated his rights under RLUIPA in cancelling congregate religious services and study groups due to the unavailability of a qualified chaplain or volunteer to act as its required leader. *West v. Grams,* No. 11-cv-687 (W.D. Wis.). In that case, the court recruited Attorney Michael J. Modl to represent West. Following a mediation with Magistrate Judge Peter Oppeneer, West and the DOC reached a settlement of West's case.

According to West, an important component of the settlement was "system-wide relief" to address his concerns about cancellations of religious services or study groups for inmates of *all* religions, not just for Muslim inmates like West. With respect to that concern, the settlement agreement stated:

> Defendants agree that routinely scheduled congregate religious programming, including Friday services (Jumuah), weekly study groups (Talim), and Eid al-Fitr prayer will not be cancelled for lack of having a community leader or DOC Chaplain of that faith available to lead the event(s). However, if an emergency or disturbance or other circumstances occurs that prevents the normal functioning of the institution, the department may postpone, cancel, or reduce the duration/frequency of routinely scheduled congregate religious programming.

8

(Modl Decl., Ex. 1 (dkt. #22-1) 2.)  The parties do not dispute that this agreement applied to all adult facilities and institutions within the DOC, and it covered all congregate programming for all religions.  The agreement further required the posting of a notice by September 21, 2016, to inmates in a library, chapel, or other central location detailing that these religious programs would not be canceled for that reason.

After the agreement went into effect on September 25, 2016, however, West alleges that he and other inmates experienced cancellation of congregate religious services and study groups due to the unavailability of a qualified chaplain or volunteer to lead the services.  After West communicated as much to Attorney Modl, he also started receiving information from other DOC inmates confirming similar cancellations.  After this lawsuit commenced and the court screened West's claims to go forward, Modl further represents that he started communicating with "well over 100 inmates" through CorrLinks, the DOC's email system, regarding cancellation of congregate religious services and study groups due to the lack of a qualified person to lead these activities.  Additionally, Attorney Modl received scores of letters from inmates providing information about cancellation of congregate religious services or study groups for multiple religions.  (Pl. Br. (dkt. #20) 8.)


OPINION

Plaintiff seeks to certify a class under Federal Rules of Civil Procedure 23(a) and 23(b)(2) to pursue declaratory and injunctive relief.  The proposed class definition is:

> All inmates at adult DOC institutions, beginning four years prior to this Court's screening decision on August 14, 2019 (Dkt. 6), who have submitted Religious Preference Forms, who are members of an Umbrella Religious

Group ("URG"), and who have experienced or are likely to experience a cancellation of a URG congregate religious service or study group, where such service or study group is a religious exercise, due to the unavailability of a qualified chaplain or volunteer to lead the service or study group.

(Pl. Br. (dkt. #20) 10.)

To certify a class, plaintiffs must satisfy a two-step process. *See* Fed. R. Civ. P. 23(a)-(b); *Lacy v. Cook Cty., Ill.*, 897 F.3d 847, 864 (7th Cir. 2018). First, the proposed class must satisfy the four threshold requirements under Rule 23(a): numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a). If the Rule 23(a) prerequisites are satisfied, then "the plaintiffs must demonstrate that one of the conditions of Rule 23(b) is met." *Lacy*, 897 F.3d at 864. In this case, in which plaintiff pursues class-wide declaratory and injunctive relief, plaintiff must further establish that the challenged conduct "appl[ies] generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Because plaintiff's proposed class is not sufficiently definite and does not meet the requirements of Rule 23(a)(1) and (3), however, the motion will be denied. *Lacy*, 897 F.3d at 863 ("A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." (quoting *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015)).

## I.     Class definition

As an initial matter, a plaintiff seeking class certification must show that the proposed class "is indeed identifiable as a class." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). If "there is no way to know or readily ascertain who is a member of

the class," then it "lacks the definiteness required for class certification." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495 (7th Cir. 2012). "Cases have recognized the difficulty of identifying class members whose membership in the class depends on each individual's state of mind." *Simer v. Rios*, 661 F.2d 665, 669 (7th Cir. 1982). As a result, courts are instructed that "[a] class is ascertainable when defined by objective criteria that are administratively feasible, without a subjective determination." *McBean v. City of New York*, 228 F.R.D. 487, 492 (S.D.N.Y. 2005).

Plaintiff argues that the putative class members here are ascertainable because the class is limited to inmates who submitted a Religious Preference Form from August 14, 2015, to the present, and are members of a recognized URG. While plaintiff's current class definition makes it feasible to identify the larger group of some 24,000 prisoners who include all potential class members, that does not answer the question of whether they *are* members of the class.[4] To narrow that group down to class members would require an inquiry into what constituted a cancelled congregate worship service or study group, and who actually intended to attend. In fairness, plaintiff attempts to address the vagueness of the class definition by adding the phrase "who have experienced or are likely to experience a cancellation of a URG congregate religious service or study group," but defendant argues that whether an individual suffered a cancellation depends on the subjective beliefs and intentions of each prisoner, especially in the context of the DOC's

---

[4] During discovery, West also represents he learned of at least 23,523 prisoners who submitted Religious Preference forms in the four years leading up to the court's screening order.

efforts to provide alternatives to in-person services or study groups for eight different URGs and the individual beliefs of subgroups and individuals within each URG.

Defendant in particular points to numerous gray areas within the URGs with respect to whether the DOC actually cancelled a service or offered perfectly acceptable alternatives.[5]  According to Michael Donovan, GBCI's Chaplain, Catholics may attend a live-stream worship service, if necessary, but only priests or deacons are permitted to lead Catholic services.  (Donovan Decl. (dkt. #27) ¶¶ 9, 15.).  Therefore, a livestream of a Catholic mass may be an acceptable alternative (particularly during the time of COVID-19), but if the DOC could not provide an ordained priest or deacon for a service in person, that *could* constitute a cancellation.  Defendant also points out that depending on the availability of the volunteer, services may need to be rescheduled for another day *or* the volunteer may not be acceptable to some of the inmates attending a worship service, creating questions as to whether such attempts at accommodation itself constitute a cancellation.

Plaintiff's reply to defendant's examples just highlights the problem.  (Pl. Reply Br. (dkt. #33).)  He primarily argues that: the DOC never took the position that the meaning of "cancelled" may be ambiguous during settlement negotiations; and regardless, this court can "in framing an appropriate injunction, require the parties to work out a functional

---

[5]  Defendant also asserts that when it entered into a settlement agreement with plaintiff, the DOC's position was that showing a live-stream of Jumu'ah to Muslim inmates, instead of in-person with a volunteer, did not constitute a cancellation.  In contrast, plaintiff now asserts that live streaming Jumu'ah was "not Jumu'ah for me."  (Pertuu Decl., Ex. 104 (dkt. #32-2) 11.)  Although the court agrees that the meaning of the term "cancelled" bears on whether the class is ascertainable, it applies only insofar as *individual* inmates deem services cancelled.  Regardless, the DOC's belief about whether it was adhering to the terms of its settlement agreement with West does not make his class definition any more ascertainable.  Indeed, that dispute may not even be a class-wide right.

meaning of 'cancel' and, if unsuccessful, the [c]ourt, with input from the parties, can determine this issue." (*Id.* at 4.)  As laid out above, these may well be issues the court will need to address *on the merits*, but the purpose of a clearly defined class seeks to *avoid* just such questions as to class membership, and plaintiff's reply gives little to no assurance that the parties, much less possible class members, will be able to come to an agreement about the meaning of "cancelled" that will not require individualized assessments of each potential class member's beliefs and treatment related to specific worship services and/or study groups.

In *Lindh v. Dir., Fed. Bureau of Prisons*, No. 2:14-cv-151-JMS-WGH, 2015 WL 179793, at *3-4 (S.D. Ind. Jan. 14, 2015), the plaintiff sought to enjoin a policy prohibiting Islamic inmates from wearing a hem or pants above the ankle under the Religious Freedom Restoration Act.  *Id.* at *1.  The plaintiff also sought to represent a class defined as "all male Muslim prisoners confined within the Bureau of Prisons," or alternatively, a narrower class defined as "all male Muslim prisoners confined within the Bureau of Prisons who identify, or will identify, themselves as being required by their religious beliefs to wear their pants above the ankle."  *Id.*  In denying class certification, the court found the description not sufficiently definite given that there was:

> no evidence in the record . . . that members of the . . . class would be ascertainable by reference to objective criteria - *i.e.,* that male Muslim prisoners ever specifically disclose to the BOP their position as to whether their understanding of Islam requires them to wear their pants above their ankles.

*Id.* at *4.

13

The proposed class here suffers from the same problem.  Although the DOC can certainly identify inmates who are members of a URG and have filled out a Religious Preference Form over the past five years, that only narrows the possible class members to roughly 24,000, which even defendant agrees is larger than the actual class.  Unfortunately, defendant raises a fair -- and undisputed -- concern that there are too many inconsistencies between the eight URGs, and among the thousands of inmates within a designated URG, to avoid inquiring into the specific beliefs of each class member.  Accordingly, class certification must be denied.

## II.    Rule 23(a) requirements

Even assuming the court could modify the proposed class definition to address, or were willing to put off questions as to the knotty meaning of "cancellation" of services or study groups between URGs, subgroups and individual members, plaintiff's proposed class does not satisfy Rule 23(a)'s commonality and typicality requirements for much the same reason.

### A. Commonality

To meet the commonality requirement, plaintiff must show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To establish commonality, plaintiff "must assert a common injury that is 'capable of class-wide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Lacy*, 897 F.3d at 865 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Put another way, "the

key to commonality is 'not the raising of common "questions" . . . but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Wal-Mart*, 546 U.S. at 350). As such, this analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Philips v. Sheriff of Cook Cty.*, 828 F.3d 541, 550 (7th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 351).

Since the common questions here do not begin to address the two inquiries pivotal to the resolution of plaintiff's RLUIPA claim, he cannot meet the commonality requirement. Plaintiff identifies the common questions of law and fact as:

> 1. Whether Defendant had a practice of cancelling URG congregate religious services or religious study groups because a qualified chaplain or volunteer was not present to lead the service or study group; and
>
> 2. Whether cancellation of congregate religious services or study groups, under these circumstances, violates the RLUIPA.

(Pl. Br. (dkt. #20) 14.) Plaintiff further argues, without citation, that "[e]very inmate who was prohibited from performing his religious exercise based on Defendant's practice would have the same answer under RLUIPA: the practice imposed a substantial burden." (Pl. Br. (dkt. #33) 10.) Moreover, since he is seeking certification under Rule 23(b)(2), plaintiff asserts that the focus should be on defendant's practice, not on the injury to any plaintiff, which is why "injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2)." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 1763 (1986). However, plaintiff's argument does not address what answering his cited common questions of fact and law would actually accomplish, which would appear to be very little in the context of plaintiff's RLUIPA claim.

To start, as previously addressed and defendant pointed out, not all class members would provide a single answer as to whether defendant had a practice of "cancelling URG congregate religious services or religious study groups" for want of a qualified Chaplain or volunteer, which is central to plaintiff's RLUIPA claim.  Rather, because the eight URGs, their sub-groups and individual members vary with respect to the acceptable modes of carrying out communal services, some may find "cancelled" services to be completely appropriate, or at least an acceptable compromise.  Defendant again provides numerous examples in which defendant's alternative to an in-person leader may (or may not) constitute a "cancellation":

- Since **Catholic** mass must be led by an ordained priest or deacon, questions include whether a non-Catholic Chaplain leading an in-person service constitutes a cancellation or whether a video-stream of a mass from another location constitutes a cancellation.

- Since **Buddhist** inmates typically gather every week, would it constitute a "cancellation" if a volunteer is available only every other week.

- Similarly, **Muslim** inmates differ with respect to whether a service is valid if it is not in-person with a qualified leader.

- **Orthodox Jews** may not deem a congregate service necessary if they do not follow the worship practices of that leader's denomination.

- **Native American** volunteer leaders may not be available for a particular tradition, so the DOC providing a member of a different tradition may or may not constitute a cancellation.

- Since **Protestant** mass generally also requires a volunteer, does the DOC's offer of a "joint mass" with a single leader of either (or a different faith tradition) for Protestants and Catholics constitute a cancellation.  Relatedly, if the leader of a Protestant mass does not offer the sacraments to an inmate based on whether that inmate was baptized within his or her faith tradition, would that be a cancellation for that inmate?

16

- **Atheists, Humanists, and Agnostics** may disagree whether watching a movie or having a discussion constitutes a service, or whether a substitute teaching that event constitutes a cancellation.

- Similarly, **Pagans** may accept a live stream as a valid service, and they may also have an inmate read pre-approved scripts so the service is not cancelled, but some inmates may disagree as to whether the service was cancelled if the inmate is not sufficiently qualified.

As for the second common question, plaintiff's position is conclusory:  "Without question, all putative class members suffered the same injury -- not being able to participate in religious exercises that are critical to their religion."  (Pl. Br. (dkt. #20) 14.)  Again, plaintiff's assumption that all putative class members will deem the absence of in-person communal services a substantial burden of their religious practices is belied by (1) the fact-intensive inquiry necessary to resolving RLUIPA claims and (2) the unrefuted differences among inmates regarding the significance of in-person communal services.

The relevant portion of RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person --
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The Supreme Court further explained that a "substantial burden" is something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available.  *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)).  While "seriously" provides scant more guidance than "substantial burden," the Seventh

17

Circuit advises that it means the violation is "more than 'modestly' and less than 'overwhelmingly.'" *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015).

In the context of plaintiff's claim, the question then becomes whether the cancellation of an in-person worship service or study group (however defined) presents a substantial burden on each class member's religious beliefs.  For plaintiff to satisfy the commonality requirement, therefore, he would need to make *some* showing that it is possible to answer this question for all inmates within the class with a straightforward "yes" or "no" *and* without the need for significant, individual inquiry.  Given the breadth of the proposed class, the contrary is true.  Plaintiff does not attempt to refute defendant's evidence of the varying ways in which inmates -- even those designating the same URG -- hold different, sincerely held beliefs with respect to what constitutes congregate worship services and study groups, nor could he.  Again, Catholics and Protestants differ as to whether they must attend mass weekly or just for religious holidays.  Regardless, according to multiple DOC officials, the majority of the inmates who submit a Religious Preference form do not routinely attend services or study groups, even when offered.  (*See* McKenzie Decl. (dkt. #31) ¶ 9; Donovan Decl. (dkt. #27) ¶ 7; O'Boyle Decl. (dkt. #29) ¶ 6; Willard West Decl., Ex. 100 (dkt. #30-1) 2.)  Furthermore, over the four years of the parties' settlement agreement, an inmate's belief in the importance of congregate services and study groups may have changed.  More practically, if the proposed class were to be certified, the court has no basis to infer that evidence about the significance of attending in-person weekly communal services to plaintiff applies to other Muslim inmates, much less any inmates belonging to a different URG.  As such, common actions, such as designating a

18

URG within four years of the screening order and having congregate religious services or study groups cancelled, would not "actually advance all of the class members' claims." *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 550-51 (7th Cir. 2016) (affirming decertification of class of detainees bringing Eighth Amendment deliberate indifference claims related to delayed dental care, since analysis of the claims required consideration of different dental issues, prison staff and medical professionals, as well as types of deficiencies); *see also McFields v. Dart*, No. 20-1391, 2020 WL 7223689 (7th Cir. Dec. 8, 2020) (affirming denial of class certification of proposed class of detainees bringing claims of inadequate dental care at Illinois' Cook County Jail, since resolution of the claims involves an individualized inquiries into the circumstances of the dental care).

Finally, plaintiff cites multiple cases for the proposition that there is a presumption of commonality in cases seeking injunctive relief. *See Monroe v. Bombard*, 422 F. Supp. 211 (S.D.N.Y. 1976) (granting class certification and awarding injunctive relief, concluding that prison beard regulations violated the religious freedoms of Sunni Muslims); *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) (finding commonality requirement met and certifying Rule 23(b)(2) class in challenge to conditions of confinement); *Olson v. Brown*, 284 F.R.D. 398 (N.D. Ind. 2012) (inmate class met commonality requirement for claims challenging adequacy of law library access and opening prisoner mail from legal institutions and attorneys, and granting injunctive and declaratory relief); *see also Lacy*, 897 F.3d at 847 (affirming grant of permanent injunctive relief and finding specifically that commonality requirement was met with respect to detainees' structural barriers for ADA claim).

However, only one of these cases involved common questions related to religious beliefs. *Monroe*, 422 F. Supp. 211.  And even *Monroe* is not particularly helpful to plaintiff, since the proposed class in that case was decidedly narrower than plaintiff's proposed class here:  the class was limited to followers of the "Orthodox Islam religion, commonly known as Sunni Muslims," *id.* at 215, and the court further limited the class to "all inmates . . . who are Sunni Muslims required to grow beards as part of their religious observance," *id.* at 219.  On its face, plaintiff's proposed class is substantially broader, not only encompassing all Muslim inmates, but all inmates that have designated a URG and faced the possibility of a cancelled congregate service or study group, without *any* consideration as to whether such a service or group study is part of that URG's, subgroup's or individual's belief system.

In *Lindh*, No. 2:14-cv-151-JMS-WGH, 2015 WL 179793, defendant further points out that the District Court for the Southern District of Indiana similarly found that that the proposed class was not only indefinite, but failed to meet the commonality and typicality requirements.  In particular, the court held that the broadest class failed both requirements because "the undisputed evidence in the record is that not all male Muslim prisoners share this religious belief on this issue," and thus the plaintiff failed to show "the [proposed] class members have suffered the same injury."  *Id.* at *6.  The court also held that individualized assessments were necessary even as to a narrowed class, thus, again failing to meet commonality and typicality requirements, explaining that "[a]nalyzing individualized factors to determine the parameters of individual claims is the antithesis of typicality."  *Id.* (citing *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 469 (N.D. Ill. 2009)

("Where, as here, a court would have to examine numerous individualized factors to determine the parameters of individual claims, the typicality requirement is not met.") (citing *Payton v. County of Carroll*, 473 F.3d 845, 854 (7th Cir. 2007))).

Plaintiff's proposed class here is *far* broader than even the plaintiff's broadest proposed class in *Lindh*, and he has not suggested any practical basis to narrow it.[6]  While the plaintiff in *Lindh* was seeking certification under Rule 23(b)(3), not Rule 23(b)(2) as plaintiff seeks here this case remains instructive.  Plaintiff's focus on the DOC's actions in particular does not account for the individualized nature of a RLUIPA claim, which is fatal to his request, especially given the breadth of the class he seeks to represent.  Accordingly, the court find that plaintiff has failed to meet the commonality requirement.

## B.  Typicality

For much the same reason, the result is the same as to the typicality requirement of Rule 23(a)(3).  To meet this requirement, plaintiff must show that his claims have "the same essential characteristics as the claims of the class at large."  *Lacy*, 897 F.3d at 866 (quoting *Oshana*, 472 F.3d at 514).  In other words, plaintiff's claim must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory."  *Id.* (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).

---

[6]   To the contrary, plaintiff's counsel notes that the plaintiff considers himself responsible for representing the interests of *all* DOC prisoners, not just those who have designated the Islamic URG or share his belief about the significance of in-person congregate worship services or study groups.  (Pl. Br. (dkt. #20) 6.)  Were he willing to narrow the proposed class in both respects, it might become manageable, although in the end it might not accomplish more than plaintiff could alone in terms of the breadth of any injunctive relief.

Plaintiff argues that there are no differences between his claims and those of the members of the putative class, asserting that "[w]hile religious services may vary based upon the religion involved, the centrality of the services or study group to the practice does not." (Pl. Br. (dkt. #20) 15.) Plaintiff cites no evidence to support this finding, nor does he confront defendant's abundant evidence to the contrary, both among and within the eight URGs, as to whether in-person services and study groups is an integral aspect of any given religious practice and what they would entail. Indeed, defendant points out that many inmates who have submitted Religious Preference Forms have *never* attempted to attend a service, and even more specifically, the undisputed evidence shows that for any given service, a majority of prisoners that identify with the URG do *not* attend.

For instance, in 2019, at DOC's Taycheedah Correctional Institution, a third of the prisoners with a designated URG attended services at most: 15 out of 94 Catholic URG prisoners; 5 out of 36 Eastern Religion URG prisoners; 10 out of 29 Humanist/Atheist/Agnostic; 4 out of 16 Islamic URG prisoners; 3 out of 14 Jewish URG prisoners; 31 out of 95 Native American/American Indian; 9 out of 77 Pagan URG prisoners; and 100 out of 486 Protestant URG prisoners. So, too, at GBCI in 2019, only 65-75 inmates who self-identified as Protestant, attended congregate services out of a possible 475. This evidence suggests that the designation of a URG does *not* equate to belief that in-person worship services is central tenant of their faith, or even of substantial value, meaning that the analysis of West's RLUIPA claim is, if not unique to him, then certainly to some subset of numbers of the Islamic URG. Defendant also repeats its concern about the individualized nature as to whether the DOC's alternatives constitute a

cancellation, pointing out that while West considers any services without an imam a cancellation, he has not shown that this belief is consistent across *all* inmates in identifying with the Islamic URG designation, much less any other faith covered by the eight URGs.

Plaintiff does not have a satisfying response to these assertions, beyond noting that the focus of typicality should be on the *defendant's* action, not plaintiff.  Again, this argument both incorrectly assumes that West's practices are the same as all inmates who have submitted URG designations within the past four years *and* ignores that plaintiff's RLUIPA claim requires an initial assessment of the *impact* of the defendant's conduct on the ability to practice sincerely held religious beliefs.

Moreover, assuming that plaintiff's personal views towards in-person congregate worship services *did* apply to all class members, and plaintiff can prove that the DOC's practices related to in-person, congregate services and study groups places a substantial burden on all members' religious practices, only then would the burden shift to defendant to establish that this burden furthers a compelling government interest using the least restrictive means.  And, even then, this test must account for: (1) West's particular conditions of incarceration *and* sincerely held religious belief with respect to communal worship in particular; and (2) the various approaches taken at the different DOC institutions.

Courts cannot avoid these individual interests when adjudicating RLUIPA claims. Indeed, as the Supreme Court recognized in *Cutter v. Wilkinson*, 544 U.S. 709 (2005):

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, . . . "context matters" in the application of that standard.  Lawmakers supporting

> RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (internal citations omitted). Accordingly, plaintiff also has failed to make a showing that his own conditions are consistent with those across all DOC institutions. *See Martinez v. Brown*, No. 0-cv-565, 2011 WL 1130458, at *10 (S.D. Cal. Mar. 25, 2011) (finding plaintiff's RLUIPA claim not typical of putative class members, noting that when "proof of liability requires individualized inquiry" a common legal theory cannot establish typicality") (citing *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006). Accordingly, plaintiff has failed to establish that his claim is typical of those within the putative class, and the court is denying plaintiff's motion for class certification.

### III.    Other Considerations.

Without reaching the question of adequacy, the court would certainly have found that Attorney Modl could adequately represent the class as counsel, but is far less comfortable as to West acting as class representative. Indeed, given West's apparent position that there is no acceptable substitute for in-person worship services and study groups — not only with respect to his own beliefs, but for his URG, much less other URGs or individuals — the evidence that some portion of the proposed class members would disagree and West's failure to adduce any evidence suggesting otherwise, leaves the court with real concerns that West's interests may be unique, at least among prisoners that have designated a different URG, if not within the Islamic URG itself. Added to this concern,

West's breach of contract claim is unique to him, which may further impact his ability to focus the litigation on the interests of the class, rather than his own.

Finally, in addition to all of the concerns above that would have complicated certification of any class, there is the question as to whether the bang would be worth the buck here, since both of West's claims would appear to allow relief that would be binding on the DOC for those similarly situated as a matter of claim and issue preclusion, if not in the terms of any injunction itself.  While the court's denial of class certification does not turn upon these other considerations, they further its reticent to grant his motion.

ORDER

IT IS ORDERED that plaintiff Rufus West's motion for class certification (dkt. #19) is DENIED.

Entered this 21st day of December, 2020.

BY THE COURT:
/s/

_____
WILLIAM M. CONLEY
District Judge