IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RUFUS WEST,

                            Plaintiff,                         OPINION AND ORDER

    v.
                                                              17-cv-335-wmc

KEVIN CARR,

                            Defendant.

Plaintiff Rufus West a/k/a Mansa Lutalo Iyapo,[1] an inmate at Green Bay Correctional Institution ("Green Bay"), is proceeding in this lawsuit against defendant Kevin Carr in his official capacity as Secretary of the Wisconsin Department of Corrections ("DOC") for alleged violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, as well as violations of the terms of the parties' 2016 settlement agreement arising out of plaintiff's earlier RLUIPA lawsuit.  Specifically, as a devout Muslim, West claims that the DOC's practice of cancelling in-person, congregate worship services and study groups when a Chaplain or other volunteer leader becomes unavailable violates his rights under RLUIPA, as well as breaches his 2016 settlement.

Currently before the court are (1) the DOC's motion for summary judgment (dkt. #42); and (2) West's motion for partial summary judgment (dkt. #50).  Having reviewed the evidence of record, the court concludes that the DOC's current policy related to congregate religious programming satisfies the requirements of RLUIPA, while on occasion

---

[1]  West now refers to himself as "Iyapo" in briefing, but to be consistent with the case caption and past orders, the court will continue to refer to him by what it understands is still his lawful, last name.  Of course, if that has changed, West is welcome to file an appropriate motion with proof of name change, and the case caption in this case will be changed accordingly.

its limited cancelations of any religious service specifically because of the absence of a Chaplain or volunteer violated the express terms of the parties' settlement agreement. Further, since entry of injunctive relief is straightforward, closely tracks the facts already considered by this court in deciding plaintiff's RLUIPA claim, and the parties' 2016 Settlement Agreement contemplated that this court would retain jurisdiction for enforcement of non-monetary relief, the court will depart from its usual practice and retain supplemental jurisdiction so far as considering entry of appropriate injunctive relief proportional to defendant's breach.   At the same time, the court will relinquish supplemental jurisdiction over plaintiff's claim for monetary damages for the breach, which raise new factual and legal questions not yet considered by this court and expressly reserved for resolution in state court under the Settlement Agreement.   Accordingly, as to the narrow question of whether plaintiff is entitled to monetary damages for its material breach of the Settlement Agreement, the court intends to relinquish its supplemental jurisdiction. Before definitively deciding on the appropriate terms of an injunction and relinquishment of jurisdiction over plaintiff's claim for monetary damages without prejudice, however, the court will hear from the parties.   Thus, the court will grant in part and deny in part the parties' cross-motions for summary judgment, and await further input on the scope of relief.

UNDISPUTED FACTS[2]

**A.  West's Religious Beliefs and Practices**

From April 11, 2014, to February 15, 2019, West was incarcerated at Green Bay. West transferred to Redgranite Correctional Institution ("Redgranite") for about a year, from February 15, 2019 to March 11, 2020, when he was transferred back to Green Bay. West remains incarcerated at Green Bay.

As a devout Muslim, West adheres to the tenants and practices of Islam.  This includes participating in the weekly Friday Jumu'ah prayer services and weekly Talim study groups held at Green Bay.  Jumu'ah is a required practice of West's Muslim faith, is to be held every Friday, just after noon, and consists of a sermon and a prayer service.  Although the sermon may be conducted in the speaker's native language or Arabic, the prayer service is to be conducted in Arabic.  Jumu'ah must also be led by a qualified individual *in person*, rather than by a pre-recorded video or even a live-stream broadcast.

Consisting of the study of Islam, Talim is also essential to a Muslim's religious development and a key component of learning to practice Islam.  Indeed, Talim is considered the *primary* manner in which Muslims learn to practice their religion, through the teachings of the Koran and Hadith, of Islamic prayers and of the Arabic language.

---

[2]  The following facts are drawn from the parties' proposed findings of fact and responses.  The court notes that defendant submitted an additional set of proposed findings of fact in response to West's summary judgment motion, to which West objects because the parties had explicitly agreed to exchange proposed findings of fact and responses.  The court has incorporated those findings of fact since plaintiff responded substantively, and these proposed findings of fact are a direct response to West's argument that the DOC could and should hire a religious leader just to accommodate his unique religious needs.

Although Talim does not need to occur on a specific day or time, it should be observed on a weekly basis.

West claims to be qualified himself to lead both Jumu'ah services and Talim study groups.  Without disputing the challenge presented by holding these sessions weekly, especially during COVID, West also maintains that cancellation of either program places an undue burden on his practice of Islam.[3]

### B.  The DOC's Religious Policies

The DOC's Religious Practices Coordinator Kelli Willard West ("Willard West") is responsible for providing policy development and guidance for the DOC's inmate religious accommodation.  Willard West also serves as the chair of the DOC's Religious Practices Advisory Committee ("RPAC"), and she participates in planning and coordinating inter-departmental and external agency activities related to religious matters.

The Division of Adult Institutions ("DAI") provides inmates with opportunities to pursue lawful practices of the religion of their choice.  However, those opportunities must be consistent with:  security practices and principles; the rehabilitative goals of inmates; health and safety; the allocation of limited resources; and the needs of the various correctional institutions and facilitates.  DAI attempts to accommodate various religious beliefs by organizing available religious accommodations through a structure of Umbrella Religion Groups ("URGs"), with each group sharing similar beliefs and practices.  Although

---

[3]  West further asserts that cancellations of these programs burden not just his but other prisoners' religious practices and includes multiple findings of fact related to the impact of cancelled programs on other inmates, but submits no formal evidence in support, except perhaps as to the importance of Talim to the practice.

neither exclusive nor immutable, DAI currently recognizes some eight, formal URGs: Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian.

### C. Congregate and non-congregate services in prison

Within this structure, DAI attempts to provide prisoners with regular worship services consistent with their personal faith.  At the same time, DAI policy requires *congregate* religious services (e.g., group worship, study, readings, prayers, choir, drumming) to be facilitated or supervised by a DOC staff member or other community volunteer who can act as the spiritual leader/clergy or chaplain.[4]  In this matter, inmates designating the Islamic URG may participate in both Jumu'ah prayer services and Talim study groups.

Worship services in particular must be facilitated by a Chaplain of that faith or by a qualified volunteer.  For example, Jumu'ah must be facilitated by an Imam; and a Native American/American Indian sweat lodge must be facilitated by a recognized spiritual leader. These requirements have caused institutions to rely on outside volunteers to come to the institution to lead weekly services.  Moreover, when no religious volunteer is available to attend a scheduled religious service, DAI policy prohibits prisoners from leading their own religious services or study groups in light of numerous security concerns associated with prisoner-led worship services, which will be discussed in more detail below.  Similarly, study groups may be supervised by a volunteer, Chaplain or other staff member, as scheduled

---

[4]  Currently, due to the COVID-19 pandemic, volunteer entry has been suspended.  However, the parties agree that COVID-related mitigation efforts should not factor into the court's analysis of plaintiff's claims at summary judgment.

and directed by the Chaplain/designee, and to avoid an inmate assuming a leadership role or dictating the content of the study group, the institution's other Chaplain or religious volunteer are expected to serve as a "teacher" for the study group.

### D. West's prior 2016 Settlement Agreement with DOC

In 2011, West filed a lawsuit in this court challenging a lack of religious accommodations at DOC's Columbia Correctional Institution ("Columbia"), where he was previously incarcerated. *West v. Grams,* No. 11-cv-687 (W.D. Wis.) ("the '687 case"). Among other things in that lawsuit, West claimed the DOC violated his rights under RLUIPA in cancelling Jumu'ah and Talim whenever a qualified chaplain or volunteer was unavailable to act as a leader. West also sought injunctive relief in the form of permitting Muslim inmates to lead Jumu'ah, Talim, and the Eid al-Fitr celebration at the end of Ramadan if no one else is available to do so. More narrowly, West further asked the court to prohibit defendants from cancelling Jumu'ah, Talim, and Eid al-Fitr when an outside Islamic volunteer is unavailable.

On November 8, 2013, Magistrate Judge Stephen Crocker granted defendant's motion for summary judgment and dismissed West's lawsuit. In response to West's motion for reconsideration, the court amended the judgment but still dismissed West's RLUIPA claim as moot because he had by then been transferred to a different DOC institution. West next appealed and on April 22, 2015, the Court of Appeals for the Seventh Circuit vacated the dismissal of his RLUIPA claim regarding cancellation of Islamic services and study groups, finding that West's transfer had not rendered his claim moot. On remand, the district court then recruited Attorney Michael J. Modl to represent

6

West.

On April 15, 2016, with the assistance of Attorney Modl, West participated in mediation with Magistrate Judge Peter Oppeneer and the parties reached a resolution of West's case.  On June 23, 2016, West and the DOC memorialized that resolution in a Settlement Agreement, which included terms acknowledging West's sincere desire to provide system-wide relief related to cancellations of religious services and study groups for all religions.   In particular, the Settlement Agreement included two, non-monetary requirements expressly binding the DOC going forward.  First, the DOC agreed to the following "Religious Programming Requirement":

2. **NON-MONETARY CONDITIONS.**

    a. Defendants agree that routinely scheduled congregate religious programming, including Friday services (Jumuah), weekly study groups (Talim), and Eid al-Fitr prayer will not be cancelled for the lack of having a community volunteer or DOC Chaplain of that faith available to lead the event(s). However, if an emergency, disturbance or other circumstance occurs that prevents the normal functioning of the institution, the department may postpone, cancel, or reduce the duration/frequency of routinely scheduled congregate religious programming. This would remain in effect until the emergency, disturbance or circumstance has ended, order is restored to the institution, and normal operations resume.

      i. Defendants agree that within 90 days after full execution of this Agreement they will arrange to assure that routinely scheduled congregate religious programs are not canceled for the lack of having a community volunteer or DOC Chaplain of that faith available to lead the event(s).

      ii. This agreement will apply system-wide to all adult institutions and adult facilities within the Department of Corrections.

(Ex. 1002, dkt. #46-1, at 3.)  That provision further provided that the Western District of Wisconsin would "retain jurisdiction to enforce only the terms of this Agreement," although not "jurisdiction over any action brought by either party seeking money damages." (Ex. 1002, dkt. #46-1, at 3.)

Second, the DOC agreed to a "Memo Posting Requirement," which required the DOC to post a memorandum by September 21, 2016, notifying prisoners that the DOC would not cancel routinely scheduled congregate programming under conditions specified in the Settlement Agreement.

The Settlement Agreement also included the following "Release of Claims" provision:

> In exchange for the consideration listed above, Plaintiff releases and forever discharges the State, the DOC, the Defendants, and their officers, agents, employees, successors, personal representatives, and insurers (the "Released parties") from any and all manner of action or actions (including causes or causes of action, suits, debts, covenants, agreements, liabilities, rights, damages, costs, claims of interest, awards of attorney fees, claims and demands of every kind and nature whatsoever, in law or equity, whether based on State or Federal law), that relate to any action or inaction -- of the State of Wisconsin, the DOC, any DOC employees, or Plaintiff -- that arises out of the events and circumstances set forth in Western District of Wisconsin Case No. 11-cv-687.

(Ex. 1002, dkt. #46-1, at 3-4.)

Finally, the Settlement Agreement included a Covenant Not to Sue, in which West agreed "not to file any new lawsuit, claims, or complaints in any court . . . against the State, the DOC, . . .  or any former or current employee of the State if such claims relate to the matters released or discharged by this Agreement." (*Id.* at 4.)  Consistent with this

8

provision and West's Release of Claims, the parties filed a stipulation of dismissal with prejudice on July 25, 2016.  At that point, the '687 Case was closed without further order of the court under Federal Rule of Civil Procedure 41(a)(1).  *West,* No. 11-cv-687-slc, dkt. ##140, 141.

### E.  DOC's Efforts to Comply with Religious Programming Requirement

Following the Settlement Agreement, DOC and RPAC leadership were notified that cancelling religious programming altogether was not the least restrictive alternative as required by RLUIPA case law, and that offering something was better than offering nothing.  According to Willard West, however, the agreement not to cancel religious events is difficult to achieve because there are variables related to volunteer availability, such as last minute conflicts (e.g., car trouble or emergencies) that the DOC simply cannot predict or control.  As a result, DOC facilities were further instructed that the least restrictive accommodation may be an adaptation of typical community services, studies and/or practices with the goal of "mirroring" typical community religious programming.

A few examples of RPAC suggested adjustments for scenarios when a volunteer is unavailable include:

- When a priest is unavailable for a Catholic Mass, a DOC Chaplain may supervise a Catholic music and readings session.

- Rather than having Native American/American Indian volunteer spiritual leader facilitate a sweat lodge ceremony, a DOC Chaplain might supervise a pipe/drum/smudging ceremony.

- When a volunteer rabbi is unavailable for a Jewish service, a facility might offer a teaching video and a DOC Chaplain may facilitate a congregate discussion.

- For Buddhist prisoners, rather than having a volunteer-led meditation, a teaching session recorded by a volunteer may be broadcast on the facility channel.

Additionally, to serve as many religious practices as possible, DOC and RPAC leadership started to emphasize the pluralistic role of the DOC's non-denominational Chaplains. This has been accomplished by offering Chaplain and chapel supervisors training on basic beliefs and practices associated with several URGs. RPAC further recommends that Chaplains develop more facility resources for addressing the needs of inmates of all faiths, including requesting study materials from volunteers, reviewing the Chapel library to ensure diverse offerings, and assigning a facility television channel for religious programming.

Despite these efforts at training and making adjustments following the Settlement Agreement, however, with 36 different facilities of varying security levels, inmate populations, rehabilitative objectives, physical plans, staffing and community resources, defendant's position is that the least restrictive religious accommodation must be assessed on a case-by-case basis, grounded in correctional, public safety and security protocols. For example, if a facility is short on security staff, certain portions of that facility may need to be shut down and program schedules may need to be adjusted.

In particular, on May 13, 2016, DOC initiated a pilot project offering Jumu'ah services via live video stream from Fox Lake Correctional Institution ("Fox Lake"), because that institution has a Chaplain of Muslim faith on staff, Chaplain Daniel Coate. At first,

the Fox Lake broadcast was streamed just to Columbia for a few weeks, then other DOC institutions were invited to participate.  This streaming service was created to prevent an outright cancellation or the need to reschedule or postpone Jumu'ah services at institutions that lacked a Muslim volunteer.  Willard West further attests that the DOC developed this plan in consultation with RPAC's Islamic advisors and the DOC's legal representatives.  In addition, since Islamic law requires that an Imam be physically present for a gathering to qualify as Jumu'ah, Chaplain Coate instructs inmates at remote sites receiving the broadcast how to participate in the khutbah (sermon), and the group prayer portions of the streamed broadcast events.  Over time, depending upon volunteer availability, at least 28 DOC sites have participated regularly or intermittently in these broadcasts, with DOC facilities having invested in purchasing equipment to ensure weekly participation when needed.

Based on communications with his attorneys, Willard West attests that the DOC and its Religious Practices Coordinator believed that West wanted to ensure Islamic programming at all DAI facilities, making the offering of programming via live stream an appropriate back-up or secondary option when an Imam could not be physically present.  Certainly, at the time of entering into the 2016 Settlement Agreement, the DOC anticipated that this potential, alternative programming would foster an effective settlement of West's previous claims related to cancellation of Jumu'ah.

### F.  Additional efforts to comply with the Settlement Agreement

The DOC took other steps to carry out the terms of the Settlement Agreement.  It promulgated "Congregate Religious Event Conduct" as guidelines to the enforcement of

DAI Policy 309.61.01.  This attachment clarifies the roles that prisoners may play in congregate worship services and study groups, along with provided guidance to DOC staff to determine when staff should intervene to prevent prisoners from exceeding their authority.  The guidelines also encourages facilities to accommodate religious programming even when an outside volunteer or chaplain of that faith is not available.  For example, chaplains or staff designees may allow the group to meet for religious activities at the scheduled time and facilitate or supervise structured and planned inmate participation in a manner that manages the risks associated with permitting prisoners to hold an authoritative role.  In particular, the Chaplain/designee may assign and supervise one or more inmates to carry out certain roles within the event, such as calling prayer, carrying the pipe, singing in choir, reading a designated passage, performing as a musician, participating in rituals or acting as the fire starter.[5]

Additionally, after observing the different scenarios facilities encounter when attempting to provide religious accommodations for congregate services and study groups, the DOC revised DAI Policy 309.61.01 itself on March 16, 2020, specifically to comply with the terms of the Settlement Agreement.  By providing a series of alternative options, that policy was modified in an effort to ensure that prisoners would be allowed to gather at a prescheduled time, even when a community volunteer or qualified DOC Chaplain is

---

[5] The DAI maintains that these guidelines can be carried out in compliance with safety and security protocols because prisoners' roles can be rotated frequently and prisoners are not permitted to set an agenda, dictate doctrine or impose religious beliefs.  Instead, the Chaplain/designee determines the content of the event, after consultation with RPAC advisors, religious volunteers and available religious resources.

not available to lead regularly scheduled religious programming.  Specifically, Section I.C.4

now states that:

> Despite efforts to recruit volunteers, there may be times when Routinely Scheduled Religious Programming does not have a community volunteer or DOC Chaplain of that faith available to lead the event(s).  During such times (except as described in subparagraph d. below), inmates shall still be permitted to gather at the prescheduled time, using the protocol outlined in subparagraphs a. through c. below.
>
> a.  If no spiritual leader/clergy, volunteer or Chaplain is available, facility staff shall supervise per guidelines established by the Chaplain/designee.
> b.  Chaplain/designee may structure inmate participation (e.g., choir/music; reading; pipe/smudging) in accordance with the Attachment -- Congregate Religious Event Conduct.
> c.  Programming may be provided in person or through electronic medium (e.g. live broadcast/teleconference, prerecorded audio/visual materials, etc.) as available.
> d.  Facilities may postpone/reschedule/cancel Routinely Scheduled Religious Programming if normal facility functioning is disrupted (e.g. emergency, disturbance, inclement weather, lockdown, modified inmate movement) arising from circumstances impacting facility security.
>   i.   Postponement or rescheduling is preferable to cancellation, when possible;
>   ii.  Upon resumption of normal operations, facilities shall prioritize resuming Routinely Scheduled Religious Programming, when feasible.
>
> e.  Facilities shall document all changes to Routinely Schedule Religious Programming via WICS Incident Report, including reason for change and expected resolution.

(Ex. 1006, dkt. #46-5, at 5-6.)

### G. DOC efforts to track compliance with the Settlement Agreement

In January of 2017, after West's counsel reported perceived violations of the Settlement Agreement, Willard West started using two means to track chapel schedule changes in order to monitor compliance with Religious Programming Requirement. First, Willard West collected facility information through "SurveyMonkey" from January 2017 to May 2020. Willard West attests that when using SurveyMonkey, she would email a link to the questionnaire to all facilities monthly, and staff members would answer the questions online. Then Willard West manually transferred that data into a spreadsheet -- the "Religious Programming Spreadsheet" -- recording chapel schedule changes site-by-site, including reason for the changes and any resolution.

Second, during roughly the same time frame, Willard West used a separate survey to track compliance with both the Religious Programming Requirement and the Memo Posting Requirement. Specifically, from April 2017 to May 2019, the DOC used a combined survey to track compliance with the Religious Programming Requirement and the Memo Posting Requirement; and from June 2019 to May 2020, the DOC discontinued the Memo Posting Requirement survey and began tracking just compliance with the Religious Programming Requirement. (*See* Ex. 1007, dkt. #46-6.) The survey then asked the respondents to indicate the reason for the change, among the following options: Lockdown - Inmate Issue; Lockdown -- Facility/Repair; Partial Lockdown -- Modified Inmate Movement; Inclement Weather Policy; Chaplain Not Available; Volunteer Not Available -- Less than 24-hours' Notice; Volunteer Not Available -- Advanced Notice; and Other. (*Id.*) If the prisoner population was too small to hold congregate programming for

the URG, the respondent would indicate "Not Applicable."  Additionally, after the March 2020 change to DAI 309.61.01, facilities reported changes to the chapel schedule through the WICS system.  Finally, starting in June 2020, the DOC has exclusively used incident reports to track compliance with the Settlement Agreement.

Willard West has reviewed the data collected with respect to the Catholic and Islamic URGs.  On a system-wide basis, she summarizes that data as follows:

- Across the 36 sites in Wisconsin, DAI provides about 108 Islamic URG religious programs and 108 Catholic URG religious programs monthly. She further estimates that DAI provides religious programming for six other URGs at similar intervals.

- In May 2017, there were seven instances in which institutions used the Fox Lake live stream for Jumu'ah, and one instance where Talim did not have a leader.  (Ex. 1010, dkt. #46-9, 20-27.)  As for Catholic programs, the DOC has a record of one cancelled Mass and one service where Bible study and rosary prayer were offered as an alternative, although plaintiff West claims that there were three, additional cancelled Masses during that month as well.

- Between July and September 2017, the DOC records indicate that an alternative for Jumu'ah was used nine or ten times, and an alternative for Talim was used three times.  (Plaintiff points out that the chart shows that a non-compliant Jumu'ah service was held at Jackson Correctional Institution once.  (*Id.* at 36-43.))  For that same time frame, 13 Catholic

15

Masses were altered; they were either rescheduled, or staff supervised a viewing of Mass or showed a DVD.

- In January 2018, alternatives were provided for at last ten Jumu'ah services and four Talim periods, and for approximately ten Catholic Masses.

- As for May 2018, the parties dispute the exact number of altered Muslim programs; West's position is that there were a total of 20 affected services and study groups.  The DOC's records indicate that there was one cancellation on May 25, 2018, at RYOCF; the other modifications provided that a Chaplain supervised a Talim, or the Fox Lake broadcast was provided.  (Ex. 1010, dkt. #46-9, at 80-86.)  Finally, four Catholic programs were cancelled during that same month.

- In September 2018, seven Muslim services were modified, with either Chaplain supervision or the Fox Lake broadcast of Jumu'ah, although on one occasion a Muslim service was recorded as cancelled for lack of a volunteer.  (*Id.* at 110-17.)  One Catholic program was outright cancelled that month.

- In January 2019, Jumu'ah was modified eight times, in which a Chaplain or staff supervised prayer, or the Fox Lake broadcast was viewed.  (Since Redgranite held Jumu'ah and Talim at the same time, that institution modified an additional two programs.)  During that same period, twelve

Catholic programs were modified or cancelled due to a lack of volunteer or qualified Chaplain.

- In May 2019, four Muslim programs were affected, and two programs were cancelled.   Seven Catholic programs were either cancelled or modified that month.   In September 2019, Muslim programs were impacted on four occasions, with each modification either being a Chaplain supervised group or the Fox Lake broadcast.   Nine Catholic programs were either cancelled or modified.

- In January 2020, 15 Muslim programs were modified:  there were two cancelled programs, and 13 alternative programs that included study time, DVDs, and self-study.   In contrast, 17 Catholic programs were either cancelled outright or an alternative was offered.

Plaintiff West claims that Willard West's tracking is incomplete because there is no data for correctional centers, although plaintiff has not come forward with evidence that actually calls into question the DOC's collection of data.  Regardless, plaintiff's counsel created three charts purporting to interpret the data in defendant's Exhibit 1010.  Counsel explains that Exhibit 3 shows cancellations of congregate religious services or study groups due to the unavailability of a qualified Chaplain or volunteer.  (Modl Decl. Ex. 3, dkt. #51-3.)  Generally, based on that interpretation, plaintiff claims that between January 1, 2017, and December 31, 2018, there were at least 125 congregate religious services or study groups that were cancelled due to the unavailability of a qualified chaplain or volunteer. Plaintiff's counsel also created Exhibit 4, which purports to show the Islamic services and

study groups that were listed as supervised by a Chaplain, staff member or volunteer, but where a qualified Chaplain or volunteer was actually unavailable.  (Modl Decl. Ex. 4, dkt. #51-4.)  Indeed, counsel's chart shows that between January 1, 2017, and December 31, 2018, approximately 120 Islamic services or study groups were *not* led by a qualified Chaplain or volunteer.  Finally, plaintiff's counsel created Exhibit 5, which is a table of religious services (primarily Jumu'ah), where the DOC showed a video or YouTube video or the service was streamed live from another institution.  (Modl Decl. Ex. 5, dkt. #51-5.)  As a result, counsel counts 50 instances in which an institution used this alternative to a Jumu'ah service offered by an *in-person* leader.

### H. West's Claims in this Lawsuit

After the agreement went into effect on September 25, 2016, West avers that he and other inmates experienced many cancellations of congregate religious services and study groups due to the unavailability of a qualified chaplain or volunteer to lead the services.  In particular, West avers that in September 2016, for a period of approximately six weeks, Talim study groups were cancelled at Green Bay because the volunteer who led the study group was visiting the Middle East, and thus, was unavailable.  During that same period, Jumu'ah services were not led by a qualified chaplain or volunteer.  West claims that inmates led the services (West Decl., dkt. #53, ¶ 31), which defendant disputes because Green Bay Chaplain Michael Donovan would still have been authorized to allow an inmate to read a pre-approved khutbah to the group (Donovan Decl., dkt. #45, ¶ 9).

Additionally, when West was at Redgranite in June and the first week of July 2019, he avers, and defendant appears to concede, that the regular volunteer who facilitated

18

Jumu'ah and Talim for Redgranite was unable to provide services.  Apparently, although Redgranite contacted other institutions to find a substitute volunteer, no one was available, a fact of which staff informed Willard West.  In that circumstance, defendant represents that Redgranite staff determined that live broadcasting of the Fox Lake Jumu'ah services was the least restrictive alternative, at least in light of security concerns and restrictions. As a result, Jumu'ah services were ultimately streamed ten times, and on seven or eight occasions, a qualified Chaplain or volunteer was unavailable for Talim, so inmates were given roles to facilitate Talim under the supervision of a Chaplain or a different religious volunteer.  West claims, however, that he and other prisoners were permitted to lead Talim study groups seven to eight times.  (West Decl., dkt. #53, ¶ 33.)

## I.  Congregate Services at Green Bay

Currently, Chaplain Donovan estimates that approximately 25-30 prisoners regularly partake in Islamic services.  Before October 2018, Green Bay offered a Friday Jumu'ah service in the Chapel weekly, as well as a Talim study group each Tuesday and Friday.  Starting October 5, 2018, however, the Friday Talim study group was replaced by a second Jumu'ah service to avoid the need for a waitlist because of a 75-person attendance limit placed on all religious services by security.  However, this change did not impact the Tuesday Talim study group, which is still being offered.[6]

Chaplain Donovan explains that for about 15 years, Green Bay has had an extremely regular Jumu'ah volunteer.  When that volunteer cannot come, Donovan contacts a

---

[6] Again, however, West maintains that at least in September and October 2016, Talim services were not offered, and Jumu'ah services were led by prisoners.

substitute volunteer, or follows the DAI Policy 309.61.01 guidelines, which permit him to allow a prisoner to read a pre-approved designated excerpt to the group. That way, a prisoner can at least read a khutbah to the group, and the group can do their ritual prayer (salat). Green Bay also has a regular volunteer for Talim, and when he is unavailable, Donovan asks a prisoner to present religious material for group discussion, which he supervises.

Once COVID-19 restrictions are lifted, Donovan attests that a lack of volunteers will not be a concern. Because of the large number of prisoners interested in attending weekly Jumu'ah services, Green Bay now offers two time slots: 12:30 p.m. and 1:45 p.m. Green Bay has also installed equipment in the chapel that can show the live video feed from Fox Lake for Islamic services. However, to date, Donovan attests that he has never used the video feed when the regular volunteer is unable to be at Green Bay for Jumu'ah. Donovan also reports that there were no cancellations of routinely scheduled Muslim services in 2017, with the exception of a period from September 22-30, when modified movement prohibited inmates from forming a group. In addition, from January 16-27 of 2018, during which Green Bay was placed on a modified lockdown due to a flu outbreak, there were no study groups or services held, and from February 2018 to May 2018, *no* Muslim services or study groups were cancelled, with the exception of a lockdown on May 15, 2018.[7] From May 31, 2018, to July 6, 2018, Green Bay was again in lockdown due to prisoner fighting. However, there were again no cancellations to Muslim services or study

---

[7] Plaintiff West *claims* that "non-compliant alternatives may have been used," but cites no evidence to support that assertion, making this fact undisputed.

groups for the rest of July and August of 2018.  Next, on September 4, 2018, and between September 16 and 26 of 2018, no Chapel activities were held due to a partial lockdown caused by reports of "hits" out on kitchen staff.  On November 9, 2018, Chapel activities were also cancelled due to a lockdown after a staff assault.  In December 2018 and January 2019, the only cancellations were on Christmas and New Year's Day:  both holidays fell on a Tuesday so Talim was cancelled due to lack of staff, and both Chaplains were not working.

**J.  The DOC's Ability to Hire for Religious Programming**

For a number of reasons, defendant represents that the DOC cannot hire additional personnel to ensure West and other inmates do not experience any lapses in religious programming.  First, hiring one person for West and others in his URG, may discriminate against other inmates.  Even within the Islamic URG, prisoners practice Sunni Islam, Shia Islam, Moorish Science Temple of America, Nation of Islam, Five-Percent Nation, and others.  Second, prisoners can have conflicting opinions on leadership qualifications, even within the same tradition.  Third, the DOC faces budgeting obstacles when it comes to creating new positions, and Willard West attests that it is already challenging to find volunteers for non-Christian URG programming, despite offering travel reimbursement and an honorarium, at least in part because Wisconsin's population is dominated by Christian faiths, and there is a small pool of candidates willing to work with prisoners from other faiths.  In any event, the cost of hiring a specific spiritual leader for each of the eight URGs at just 19 of the larger institutions within Wisconsin, would require hiring some 152 individuals, which at a salary of just $31,000 a year would cost $4,712,000 annually.

OPINION

Plaintiff West is proceeding on two claims:  (1) an RLUIPA claim arising from the alleged cancellation of regularly-scheduled congregate religious programs; and (2) a common law breach of contract claim due to defendant continuing to cancel regularly-scheduled congregate religious programs for lack of volunteer or DOC chaplain.[8]  The parties have filed cross motions for summary judgment on these claims.

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When the parties cross-move for summary judgment, then the party with the burden of proof on a claim in dispute or defense must go beyond the pleadings to establish affirmatively a genuine issue of material fact.  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).  If either party fails to establish the existence of an element essential to his or her case, and on which that party will bear the burden at trial, then summary judgment against that party is appropriate.  *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

---

[8]   Although plaintiff initially brought a breach of contract claim related to the Memo posting requirement as well, plaintiff agrees that dismissal of this claim is appropriate. (*See* dkt. #61, at 4.)

## I.   RLUIPA Claim

### A.   Release

As an initial matter, defendant seeks summary judgment on plaintiff's RLUIPA claim on the ground that plaintiff released it by the terms of the Settlement Agreement. Wisconsin contract law governs the scope and effect of any release. *Dietrich v. Trek Bicycle Corp.*, 297 F. Supp. 2d 1122, 1126 (W.D. Wis. 2003); *Heard v. Tilden*, 809 F.3d 974 (7th Cir. 2016).   "[S]ettlement agreements must be read to 'give effect to the parties' intent, as expressed in the contractual language.'"   *Boehm v. Svehla*, No. 15-cv-379-jdp, 2017 WL 4326308, at *7 (W.D. Wis. Sept. 27, 2017) (quoting *Seitzinger v. Cmt. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426).

Defendant argues that since plaintiff is seeking the same basic injunctive relief against the same DOC policy in both the '687 case and this case, he released any RLUIPA claim again being pursued in this lawsuit.   As plaintiff correctly points out, however, this lawsuit involves a *new* set of events and circumstances than the '687 case, which involved cancelled services between 2012 and 2013, and *at most*, the general release in the Settlement Agreement, which was executed by him on June 23, 2016, bars similar suits for matters through that date, not prospectively for future events.   In contrast, the cancellations of which he complains in *this* lawsuit all occurred *after* 2016.   Thus, while the *circumstances* surrounding the alleged cancellations may arise in this case from the same general policy as the cancellations of religious programs that prompted the '687 case, the language in the general release did not explicitly state that plaintiff was releasing claims related to any cancellations (or perceived cancellations) of religious programming that

occurred *after* the Settlement Agreement was executed.  Moreover, defendant is unable to direct the court to *any* helpful applicable Wisconsin case law discussing whether a party to a settlement agreement may release a statutory claim of this nature into the future.  If anything, the Settlement Agreement is ambiguous as to the scope of release, and the parties' intent is disputed.  *See Muchow v. Goding*, 198 Wis. 2d 609, 629, 544 N.W.2d 218 (Ct. App. 1995) (when a party's intent as to the scope of a release is at issue, "summary judgment is generally inappropriate").  Accordingly, defendant is not entitled to summary judgment on the RLUIPA ground of release.

### B.  Merits of RLUIPA Claim

This leaves the merits of plaintiff's claim under the relevant portion of RLUIPA, which mandates that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person --
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Elaborating on this provision, the Supreme Court has explained that a "substantial burden" is something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available.  *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)). While "seriously" provides scant more guidance than the phrase "substantial burden," the

Seventh Circuit advises that it means the violation is "more than 'modestly' and less than 'overwhelmingly.'" *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015).  The Supreme Court's guidance in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), further grounds a district court's analysis of defendant's efforts related to congregate services and study groups:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, . . . "context matters" in the application of that standard.  Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

*Id.* at 722-23 (internal citations omitted).

Accordingly, for purposes of summary judgment, the parties agree that outright cancellations of Jumu'ah or Talim places a substantial burden on plaintiff's ability to practice his sincerely-held religious beliefs.  Indeed, defendant has not suggested that the half-dozen or so instances in September and October of 2016 when volunteers were unavailable to Jumu'ah and Talim did not amount to a substantial burden.  Defendant also appears to concede that plaintiff's experience at Redgranite placed a substantive burden on his ability to participate in Jumu'ah and Talim consistent with his sincerely held beliefs. So, plaintiff has met his burden with respect to the first element.  Accordingly, the crux of the parties' dispute is on whether the current iteration of DAI 309.61.06, and the circumstances at Green Bay where plaintiff currently is incarcerated, meet the "exceptionally demanding" strict scrutiny standard -- compelling interest and least

restrictive means -- which the court addresses below.  *Dunn v. Smith*, 141 S. Ct. 725, 725 (2021).

### 1.  Compelling interest

As an initial matter, there is no dispute that the DOC has a compelling governmental interest in maintaining prison safety and security, and more specifically, in avoiding shifting power dynamics among prisoners and between staff and prisoners.  Where the parties part ways is whether the DOC's rule prohibiting prisoner-led services and study groups is, in fact, narrowly tailored to further those interests, and whether there are alternatives that are less restrictive.

As already noted, DAI Policy 309.61.01 explicitly prohibits prisoners from leading or conducting a religious service or study group out of the understandable concern that inmates might exercise unchecked or unstructured religious leadership roles.  Specifically, the DOC's position is that fundamental security practices would be violated if prisoners were allowed to lead, have power over one another, be in a position of authority, or be in charge of a group of prisoners in *any* type of prison activity, both secular and non-secular in character.  This is because permitting prisoners to take leadership roles places them in a "quasi" staff or volunteer role, which can disrupt the power dynamic and blur the necessary distinction between staff and inmates.

Moreover, DOC Coordinator Willard West represents that before 2001, prisoners *were* allowed to lead religious services.  Unfortunately, prisoner leaders were discovered to be using congregate religious programming to conduct gang and racial hate group communications, as well as disseminate subversive information.  Unsurprisingly, since

then, the DOC's official position is that allowing gang or security threat group leaders to operate as religious advisors within a prison unreasonably allows them to use their position of power to organize illegal activities and enterprises, including drug dealing, extortion, and attacks on other inmates or staff.  Willard West further cites a concern that prisoner leaders might elicit personal information from other prisoners, which could be used for illicit purposes.

Similarly, the DOC has concerns that a prisoner may not be sufficiently knowledgeable to provide accurate teaching, which may lead to conflicts with other prisoners about differing interpretations of test or religious doctrine.  Other, security-related concerns include promoting competition for dominance between prisoners, and DOC staff being unable to rely on a prisoner monitoring URG's events, especially when it comes to preventing the passing of contraband, enforcing prison rules, or disclosing security related concerns, including threats of harm, riot or escape plans, the presence of drugs, or other criminal activities.  With these compelling reasons in mind, the court turns to the least restrictive means element of strict scrutiny review.

### 2.  Least Restrictive Means

To meet its burden of showing that DOC is utilizing the least restrictive means available to achieve its security and safety interests, defendant begins by pointing specifically to the 2016 guidance, which was created to permit prisoners to engage in religious programming when a volunteer is unavailable while allowing institution staff to preclude prisoners from engaging in activities that has the potential to shift the power dynamics or facilitate illicit communications between prisoners.  Now an official part of

that policy, the guidance notifies staff that prisoners may still meet at a scheduled time and participate in certain, more limited religious practices, provided any prisoner role in leading these practices occurs on a rotating basis and under supervision by a prison official.

Defendant readily acknowledges that this guidance does not afford a full substitute for the actual religious service, but argues that permitting prisoners to engage in certain specified rituals, with individual prisoners taking on roles reserved for a Chaplain or volunteer on a rotating basis, is a better alternative than cancelling the gatherings altogether, and a safer alternative to allowing one prisoner to dominate the religious service or study group. Moreover, the 2020 revision to the policy made the guidance mandatory policy, listing several different alternatives for prisoners when a volunteer or qualified Chaplain is not available, including Chaplain/designee supervision, permitting prisoners to carry out specified roles, and the use of broadcasts (such as the weekly Fox Lake Jumu'ah broadcast). While acknowledging that Islamic law requires an Imam to be physically present, the DOC believes that providing this alternative meets the requirements of RLUIPA, pointing out in particular the efforts by Chaplain Coate at Fox Lake to instruct prisoners on how to participate in the khutbah and group prayer portions of the streamed broadcast events.

Since the 2016 Settlement, defendant also acknowledges that plaintiff's actual experiences included: multiple cancellations of services in September and October of 2016 when plaintiff was at Green Bay; and because there was no Jumu'ah volunteer at Redgranite in June and July of 2019, the Fox Lake livestream was the least restrictive option available at that time. In particular, as to the latter, defendant emphasizes that: (1) Redgranite

28

made efforts to find a volunteer once the institution received notice that the volunteer was unavailable; and (2) the Redgranite Chaplain found that Chaplain Coate did a "wonderful" job facilitating the remote Jumu'ah service.  Defendant further points out that since the summer of 2019, the Jumu'ah and Talim volunteers have been extremely reliable, which plaintiff does not dispute.  Nor does plaintiff dispute that since 2017, with the exception of COVID-19 pandemic restrictions in 2020, there have been *no* cancellations of Islamic services or study groups due to lack of a volunteer.

Still, plaintiff argues that there are obvious less restrictive alternatives that the DOC has failed to pursue without any justification or explanation.  Most glaring, according to plaintiff, the DOC failed to use the 90-day compliance period in 2016 to "recruit, hire, or contract with individuals to ensure that all religious programming is properly staffed." (Dkt. #61, at 17.)  Instead, according to plaintiff, the DOC took the less costly route of merely instructing staff that cancelling programming does not satisfy RLUIPA.  However, plaintiff does not dispute that the DOC has devoted funding and resources to:  provide training to facility staff and Chaplains, and implement the technology necessary to broadcast the Fox Lake service livestream to at least 28 DOC institutions on a weekly basis, although the DOC has not provided a dollar figure for the amount spent towards these efforts.

Defendant's burden is not to explain away every conceivable alternative, *Holt*, 574 U.S. at 371 (Sotomayor, concurring), but plaintiff has raised a fair point that the DOC should, at minimum, explain why it failed to take *any* steps towards hiring new individuals. Still, though unsatisfactory to plaintiff, defendant's explanation that the hiring alternative

would have been far from simple to implement, and in all likelihood, would have been prohibitively expensive and likely resulted in a new set of legal challenges.

In *Holt*, the Supreme Court explained that to apply the compelling interest test, courts are to consider the specific harm the defendant would suffer by accommodating the plaintiff's particular religious belief, and balance it against the asserted interest.  574 U.S. at 862.  Here, if the DOC created an exception for plaintiff's institution alone, as he suggests, and hired or contracted with an Imam to provide *in person* Jumu'ah services at Green Bay, rather than create a live service with an Imam already on staff elsewhere to be transmitted to all institution, the DOC arguably would be showing a clear preference for one religion over another, not to mention for one institution over over thirty others.  Given that there are many subgroups of Islam, *and* seven other, non-Islam URGs recognized within the DOC, the hiring of an Imam qualified to satisfy plaintiff's specific religious needs was never a realistic alternative for the DOC.  Indeed, if the DOC hired an Imam as plaintiff desires, it would be exposing itself to legitimate First Amendment establishment clause and/or Fourteenth Amendment equal protection clause claims on the ground that plaintiff received preferential treatment on the basis of his religion.  *See West v. Kind*, No. 17-cv-482-PP, 2020 WL 1139800, at \*12 (E.D. Wis. Mar. 9, 2020) (prison officials did not violate RLUIPA in declining to make exception for strip search policy where plaintiff was subjected to strip search by transgender man, since the exception could subject those officials to liability under employment discrimination statutes).

Accordingly, if plaintiff's proposed alternative were implemented legally, the DOC would have needed to hire religious leaders for *all* of its facilities and for each URG (and

possibly URG sub-sets, depending upon the nature of the differences).  Certainly, RLUIPA anticipates that the government may need to incur certain costs to comply with its provisions.  *See* 42 U.S.C. § 2000cc-3(c) ("[T]his chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.").  However, the immense administrative and financial burden of such a hiring initiative is not what Congress intended.  *See Cutter*, 544 U.S. at 723 (explaining that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard 'consistent with consideration of costs and *limited* resources.'" (emphasis added)).

Indeed, to create new positions, the DOC would have to begin by obtaining approval as a part of the State of Wisconsin's biennial state budget, and although plaintiff would advocate for hiring spiritual leaders on a contract basis, even that arrangement can be expensive.  More practically, given the DOC's experience in trying to recruit volunteer spiritual leaders, hiring for Imam positions in particular would remain challenging given Wisconsin's population demographics, particularly with respect to rural institutions.  In fact, DOC Coordinator Willard West attested without contradiction that the DOC has difficulties recruiting part-time Chaplains of any faith as it is, given the lack of pay and benefits.  (Willard West Second Decl., dkt. #59, ¶ 8.)[9]  Most importantly, the cost of hiring so many spiritual leaders across all of the DOC's facilities would be significant, particularly given the DOC's already limited budget, as well as hiring and retention

---

[9]   Defendant further points out that the DOC would need to vet the candidates and make determinations about qualifications, but since the DOC already takes on that responsibility with respect to Chaplains and religious volunteers, this might be a less onerous endeavor.

challenges across its entire staff, requiring funds to be diverted from other important interests within the DOC.

While plaintiff suggests that the DOC could be "more active" in terms of recruiting and offering volunteers stipends, plaintiff does not dispute evidence that the DOC attempted to recruit volunteers where there are gaps in coverage, and the declarations of Chaplains Donovan and Gravunder suggest that current Chaplains do make diligent efforts to fill in those gaps as they arise; in fact, Chaplain Donovan attests that he has recruited a "substitute volunteer" who he contacts when the regular Jumu'ah volunteer has to cancel. Further, the DAI policies already provide that religious volunteers can receive an honorarium and/or a mileage reimbursement. Other than that associated with a salary or hourly contract wage, plaintiff does not even identify other incentives the DOC has declined to try to attract more volunteers.

Instead, plaintiff suggests DOC's explanations for not doing more are disingenuous because these potential barriers were never brought up during settlement negotiations in the '687 case. However, there is no evidence that the parties agreed that the DOC would make efforts to hire new religious leaders in that case, either on a full-time or contract basis, so the absence of this discussion makes sense. Absent evidence that the DOC made *affirmative* representations about its ability to recruit and pay for more religious leaders, any failure on the part of the DOC to raise these concerns during settlement negotiations is no reason to question the accuracy of the DOC's representations now.

Of course, plaintiff points to another alternative: the DOC can, but refuses to, permit qualified prisoners to lead congregate religious activities. While plaintiff purports

to challenge the DOC's position that permitting prisoners to lead religious programming poses safety and security risks, the Seventh Circuit has already recognized that prison officials may prohibit inmates from conducting "their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners." *Turner v. Hamblin*, 590 F. App'x 616, 620 (7th Cir. 2014) (quoting *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988)).

Plaintiff also offers little in the way of evidence calling into question the risks associated with prisoner-led religious programming.  First, plaintiff faults the DOC for citing to its pre-2001 policy permitting prisoners to lead religious programming, arguing that the DOC's concerns were unsubstantiated.  Yet plaintiff does not dispute defendant's evidence that the DOC did, *in fact*, encounter a scenario in which a prison gang used religious programming as a means for illicit communications and disseminating subversive information.  To the extent plaintiff maintains that this risk has been eliminated in the past 20 years, defendant directs the court to a March 2020 publication from Federal Bureau of Prisons ("BOP"), which specifically identified prisoners vying for leadership roles with religious groups as a source of illicit activities.  (*See* Ex. 1009, dkt. #46-8.)  Although plaintiff appears to suggest that this article is evidence that institutions in at least 20 other states, as well as the BOP's other institutions, successfully permit prisoners to lead religious programs, plaintiff does not identify the state institutions that allow prisoners to lead services, nor does he attempt to compare the policies in effect at those institutions to the current version of DAI 309.61.01.  In any event, given the BOP's warning that this type of programming renders a correctional facility vulnerable to such illicit activities, plaintiff's

argument is a stretch, and this court is inclined to defer to the DOC's professional judgment on this point.

As for specific proof, plaintiff claims that in the fall of 2016, prisoners led certain Jumu'ah services, and in 2019, he and other prisoners led Talim study groups (West Decl., dkt. #53, ¶¶ 31, 32).  However, plaintiff does not detail how those services were carried out, and in particular, whether the services and study groups went unsupervised or, critically, whether prison officials explicitly authorized prisoners to lead those services, or whether prison officials followed DAI 309.61.01, ensuring that the prisoners rotated those roles within service or study group.  Accordingly, these isolated instances of alleged prisoner-led services do not undermine the DOC's assertion that its current policy is the least restrictive means to further its interest in institution safety and security.

Moreover, neither party has directed the court to a decision addressing an RLUIPA challenge to a prohibition of prisoner-led religious programming, and the court has been unable to locate a decision in which a prisoner has succeeded on a RLUIPA claim related to the institution's right to cut back on the scope of services due to an inability to recruit an in-person spiritual leader, much less due to unexpected unavailability of such leader for reasons outside the institution's control.  To the contrary, although somewhat recently, the Court of Appeals for the Fifth Circuit found that a policy requiring congregate religious service to be led by a volunteer and supervised by a prison official did not violate RLUIPA, noting in particular that the substantial burden faced by Muslim prisoners who were unable to congregate for weekly services was caused by the lack of volunteers, not the prison policy

requiring direct supervision of certain congregate religious services.  *Brown v. Collier*, 929 F.3d 218 (5th Cir. 2019).

Plaintiff does cite to one district court decision in which the court faulted prison supervisors for failing to even consider permitting prisoners to lead services under the supervision of a correctional officer.  *See Utt v. Brown*, No. 5:12-CT-3132-FL, 2015 WL 5714885, at *11 (E.D.N.C. Sept. 29, 2015).  However, in the *Utt* case, the district court addressed a claim brought by a Wiccan prisoner who claimed that the North Carolina Department of Public Safety ("DPS") was inequitably applying its policies regarding religious service, and the court was unpersuaded that the institution's policy requiring outside volunteers for worship services merited summary judgment.  *Id.*  Although the court faulted the institution for failing to consider the correctional officer supervision alternative under these circumstances, in denying defendants' motion for summary judgment, the court was more troubled by the plaintiff's assertion that this policy was being applied inequitably towards Wiccans.  That same court came to the same conclusion in a different decision, involving RLUIPA and First Amendment challenges to the same policy, brought by an Orthodox Messianic Jew, who claimed that the policy was applied inequitably towards prisoners of his faith.  *Hodges v. Brown*, No. 5:11-CT-3242, 2015 WL 736077, at *9 (E.D.N.C. Feb. 20, 2015).

Regardless, these two district court decisions provide little guidance on the facts in this case, where plaintiff does not claim that the policy is being enforced inequitably against Muslim prisoners.  A more important distinction for purposes of summary judgment is that, unlike the defendants in *Utt* and *Hodges*, the DOC here *has* specifically considered

and rejected the alternative option of allowing prisoners to lead religious programming under supervision, and instead formulated ways to avoid cancelling religious services altogether, by either permitting prisoners to rotate roles to carry out religious rituals when the schedule programming cannot proceed for lack of a volunteer, or through the livestreaming provide an alternative means for plaintiff to view an actual service.

Particularly given the evolution of DAI 309.61.01 since 2016, showing a concerted effort to provide various alternatives rather than outright cancellations of scheduled programming, the court concludes that the DOC has neither failed to consider seriously nor implemented other feasible options that guarantee plaintiff will not miss Jumu'ah or Talim because a volunteer was unavailable. Indeed, the current version of DAI 309.61.01 leaves open the possibility that plaintiff's ability to practice Jumu'ah and Talim in complete accordance with his sincerely held religious beliefs may be substantially burdened, albeit for reasons largely outside the DOC's control. In addition, however, the record reflects deliberate ongoing efforts by the DAI to both avoid those instances as much as practicable and to adopt specific steps for prisoners to engage in religious practices in a meaningful manner when a volunteer or qualified Chaplain is unavailable, while simultaneously seeking to prevent individual prisoners from taking on any inappropriate leadership roles that might create reasonable safety or security concerns. Moreover, plaintiff does not question Chaplain Donovan's undisputed representations that as to Green Bay where plaintiff currently resides, the DOC now has extremely consistent Jumu'ah and Talim volunteers, a substitute Jumu'ah volunteer, the ability to show the Fox Lake livestream of Jumu'ah if both volunteers are unavailable; as well as adopted a practice of supervising a

presentation of religious readings as a substitute for Talim in the unlikely event a volunteer is unavailable.

Given this record, the court cannot reasonably conclude that these available alternatives do not amount to the least restrictive means for the DOC to further its compelling interest in avoiding non-rotating prisoner-led religious programs. Accordingly, the court will grant defendant's motion for summary judgment with respect to the RLUIPA claim, and deny plaintiff's motion with respect to this claim.

## II.    **Wisconsin Breach of Contract Claim**

This leaves plaintiff's Wisconsin breach of contract claim. Defendant asks that the court relinquish jurisdiction over this claim in its entirety, citing "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction.").

However, a court may depart from this "usual practice" and continue to exercise supplemental jurisdiction if the circumstances weigh in favor of its doing so. In particular, "'judicial economy, convenience, fairness and comity may point to federal retention of state-law claims . . . when it is absolutely clear how the pendent claims can be decided.'" *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020) (quoting *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)). Here, principles of comity

37

and efficiency, as well as the fairness to the parties, are all served by this court retaining jurisdiction over plaintiff's breach of contract claim for purposes of entering non-monetary relief. Indeed, although in the '687 case the parties failed to ask the court to retain jurisdiction of non-monetary enforcement of the terms of the Settlement Agreement, there is no question that the parties expressly contemplated that this court would retain federal jurisdiction for that purpose:

> The Western District of Wisconsin will retain jurisdiction to enforce only the terms of this Agreement. The Western District of Wisconsin will not retain jurisdiction over any action brought by either party seeking monetary damages.

(Dkt. #46-1, at 3.) Moreover, the remaining breach of contract question requires only a straightforward interpretation of the plain meaning of "cancelled" under the Settlement Agreement, and application of that term to a set of undisputed facts this court has already taken up in detail in this case with respect to plaintiff's RLUIPA claim.

As an initial matter, the parties agree that when the institution does not hold a regularly scheduled congregate service, without providing *any* alternative to the scheduled service, a cancellation occurred. Therefore, the DOC breached the Settlement Agreement with respect to (1) plaintiff's personal experience in September and October of 2016, when there was no qualified Chaplain or spiritual leader at Green Bay for approximately six weeks *and* both Jumu'ah and Talim services were cancelled outright with no apparent attempt by Green Bay officials to provide any kind of replacement service or programming, and (2) the approximate 125 instances of cancellations between January 2017 and December 2018, that plaintiff identifies and the DOC concedes were similarly cancelled outright. Indeed, the defendant does not dispute that these cancellations breached the Settlement

Agreement; instead, he asserts that the doctrine of substantial performance excuses these breaches, since this number of cancellations is an extremely small percentage (approximately 0.6%) of the total number of programs and services offered throughout the DOC's facilities during that timeframe.  However, defendant cites no authority suggesting that this doctrine, which is arguably limited to discrete performance disputes related to construction or building contracts under Wisconsin law.  Further, to the extent substantial performance extends to other forms of contracts, it is even more dubious that this defense would apply to situations where a party's performance obligations is plainly stated *and* ongoing.  *Domanik Sales Co. v. Paulaner-N. American Corp.*, 241 Wis. 2d 48, ¶ 10, 2000 WL 1855144 (Wis. Ct. App. 2000) (declining to apply doctrine to a distributorship agreement, noting in particular precedent applying the doctrine to only personal service or construction contracts, which involve "the aim to cure minor imperfections that are inevitable in such situations").[10]  Indeed, accepting defendant's position requires the court to find that defendant could *continue* to cancel congregate services or study groups outright for lack of a volunteer, so long as the cancellations are sufficiently infrequent.  Finding no support for this proposition in Wisconsin contract law, the court finds that plaintiff has carried his burden to prove that defendant breached the non-monetary term of the Settlement Agreement with respect to outright cancellations solely for the reason of the absence of a Chaplain or volunteer to lead.

---

[10] This is *not* to decide that such a defense is not available with respect to the award of monetary damages under Wisconsin law, which is one of the many legal and factual disputes this court will leave for the parties' to negotiate over or for a state court to decide.

Plaintiff goes too far, however, by insisting that the instances in which plaintiff and DOC inmates who were offered *alternatives* to cancellation (either through live streaming services or by allowing a program or service to proceed with supervised prisoners rotating roles) amounts to a cancellation under the Settlement Agreement.  *First*, the court must construe the unambiguous terms of the contract under their "plain or ordinary meaning . . . consistent with what a reasonable person would understand the words to mean under the circumstances."  *Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶ 28 (citations omitted).  Here, the term "cancelled" as used in the context of a settlement agreement to resolve the alleged RLUIPA violations means that the institution decided "not to conduct or perform (something planned or expected) usually without expectation of conducting or performing it at a later time."  *See* "cancel," Merriam-Webster.com, 2021, https://www.merriam-webster.com.   Applying this definition to instances in which the institution still conducted the service or program in a modified way, the most reasonable conclusion is that when a decision was made to modify rather than discontinue the planned service completely, no cancellation occurred.  While plaintiff asks that the court interpret "cancelled" essentially to read the requirements of RLUIPA into the terms of the Settlement Agreement, arguing in particular that the parties' crafted the Settlement Agreement to avoid future RLUIPA violations, this assumes that the alternatives the DOC have offered violate RLUIPA.  Since the court has held that it does not, that request is of no help to plaintiff.  Ultimately, then, the term "cancelled" is not defined in RLUIPA *or* the Settlement Agreement in a manner suggesting that the parties intended that term to mean anything more than that the regularly scheduled program, service or at least a

practical equivalent, given the challenges of an inmate-led service, did not take place as scheduled.

*Second*, notwithstanding the plain reading of "cancelled" in the context of an RLUIPA settlement, plaintiff maintains that "the parties agreed that Defendant could have 90 days to hire additional chaplains and to recruit additional volunteers who were qualified to lead congregate religious services and study groups." (Pl. Br., dkt. #54, at 5.) Yet nothing in the Settlement Agreement precluded the DOC from using the 90-day compliance period to educate staff about appropriate alternatives, much less take the additional steps it has since signing the 2016 Agreement to provide more robust and accessible programming across its facilities. Moreover, to accept extrinsic evidence about the parties' underlying intent, the court would need to be persuaded that the contract language is "fairly susceptible to more than one reasonable construction," *State ex rel. Massman v. City of Prescott* 2020 WI App. 3, ¶14, 938 N.W.2d 602, and the court is not so persuaded. In any event, the injection of extrinsic evidence works against plaintiff's position; he cites no evidence of record related to this supposed understanding about recruiting more volunteers, and defendant has submitted evidence that in 2016, the DOC understood its obligation was to make every effort to have in-person volunteers for the regularly scheduled programming, and it was actively developing other alternative services and programming, which it has since incorporated into DAI 309.61.01, in the event a Chaplain or volunteer is still unavailable despite its best efforts to avoid that eventuality.

In short, the term "cancelled" in the Settlement Agreement means that a regularly scheduled religious program or service did not occur. If the DOC provided an alternative

method of carrying out the program or service than planned due to the unavailability of a qualified Chaplain or volunteer on the other hand, that service was not "cancelled." The question, therefore, becomes whether plaintiff is entitled to injunctive relief with respect to the proven cancellations. Plaintiff seeks injunctive relief in the form of specific performance, and would like to be heard on how such relief could be crafted. However, given the court's interpretation of the term "cancelled," such a step seems unnecessary. Instead, the court will ask the parties to react at tomorrow's status conference to the following proposed injunction, which tracks the language of the Settlement Agreement:

> **Defendant is enjoined from cancelling routinely scheduled congregate religious programming, including Friday services (Jumu'ah), weekly study groups (Talim), and Eid al-Fitr prayer for lack of having a community volunteer or DOC Chaplain of that faith available to lead the event(s). However, if an emergency, disturbance or other circumstance occurs that prevents the normal functioning of the institution, the Department of Corrections may postpone, cancel or reduce the duration/frequency of routinely scheduled congregate religious programming, which would remain in effect until the emergency, disturbance or circumstance has ended, order is restored to the institution, and normal operations resume.**

That leaves plaintiff's breach of contract claim for monetary damages. Plaintiff concedes that he may not collect monetary damages for other prisoners' cancellations, but insists that he is entitled to monetary damages with respect to his own missed services. There appears no factual dispute that the six-week period of time in 2016 when Green Bay's Jumu'ah and Talim services were cancelled outright because a leader was unavailable in breach of the parties' 2016 Settlement Agreement, resulting in plaintiff being denied their religious benefits. What appears less clear is how plaintiff would measure his

contractual damages at his institution in 2016, and whether he intends to pursue a jury trial with respect to that claim.  Given these questions, and because this court remains convinced that only plaintiff's ability to enforce the non-monetary provision of the Settlement Agreement is properly before this federal court under its exercise of supplemental jurisdiction, the court is inclined to relinquish jurisdiction over this aspect of plaintiff's breach of contract claim and dismiss it without prejudice.  However, the court will hear from the parties at tomorrow's status conference before entering that order.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #42) is GRANTED as to plaintiff's RLUIPA claim, and DENIED as to plaintiff's breach of contract claim.

2) Plaintiff's motion for partial summary judgment (dkt. #50) is GRANTED as to plaintiff's breach of contract claim for injunctive relief, and DENIED as to plaintiff's RLUIPA claim.

3) The October 27, 2021, scheduled conference is therefore, narrowed to a discussion of the appropriate language for this court's entry of a permanent injunction and relinquishment of supplementary jurisdiction over plaintiff's claims for monetary damages, if any.

Entered this 26th day of October, 2021.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge